Alex Peoples CARTER, III, by his Guardian ad Litem, A. P. Carter, Jr., and Elliott Clyde Shelton, Jr., Plaintiffs,

v.

SEABOARD COAST LINE RAILROAD COMPANY, Defendant.

Civ. A. No. 70–819.

United States District Court, D. South Carolina, Charleston Division.

Nov. 4, 1970.

Gerald C. Smoak, Walterboro, S. C., for plaintiffs.

A. Baron Holmes, III, Charleston, S. C., for defendant.

## OPINION and ORDER

DONALD RUSSELL, District Judge.

This is an action in tort, originally filed in the Court of Common Pleas of Colleton County, South Carolina, and by seasonable petition removed to this Court. It seeks recovery of damages for injuries allegedly sustained by the minor, Alex Peoples Carter, III, in a railroad collision. The plaintiffs are the guardian *ad litem,* the minor's father, a resident of Colleton County, and Elliott Clyde Shelton, Jr., an alleged assignee of a $\frac{1}{100}$ interest in the minor's cause of action and a citizen and resident of Richmond, Virginia. The defendant railroad is chartered under the laws of, and has its principal offices in, Virginia.

The petition for removal to this Court shows that the amount in controversy herein exceeds the jurisdictional amount. It also asserts that the assignment to the co-plaintiff Shelton was invalid and a sham and should be disregarded in determining diversity. It concludes with the claim that the action is one wholly between the guardian *ad litem,* and his minor son, on the one hand, and the defendant, on the other, and that, as between them, there is the required diversity for federal jurisdiction.

The plaintiffs have now moved to remand, contending that the addition of Shelton as a party-plaintiff destroyed diversity and prevented removal. In the consideration of such motion, the parties, by agreement, have taken the depositions of both the guardian *ad litem* and Shelton and such depositions have been submitted to the Court.

**370**

The real issue on the motion to remand is the effect to be given the assignment executed in favor of Shelton. If it is to be disregarded *for jurisdictional purposes,* then the motion to remand should be denied. Should it be given full force and effect *for jurisdictional purposes,* then plaintiffs' motion should be granted. In resolving such issue, the Court must consider the circumstances of the assignment.

The reason for the assignment was plainly stated in the application of the guardian *ad litem,* filed with the Circuit Court of Colleton County, for authority to execute a nominal assignment of a ⅟₁₀₀ interest in the minor's claim. In this application, the guardian *ad litem* alleged that the purpose of the proposed assignment was "to retain jurisdiction in Colleton County" of the minor's action for damages because it was believed "that a more favorable verdict might be rendered by a jury composed of citizens of the home county of your Petitioner (i. e., the guardian *ad litem*) and the said minor." Apparently at the time, the attorneys for the minor had no particular assignee in mind but requested merely general authority "to assign an interest in the aforesaid cause of action to a resident of the State of Virginia." The Circuit Court granted *ex parte* the requested authority.[1]

Through Shelton's brother-in-law in Beaufort, the attorneys for the minor approached Shelton as a resident of Virginia and requested his acceptance of as-signment of a minimal interest in the minor's claim for the purpose of defeating federal jurisdiction. Receiving a favorable response, the attorneys mailed Shelton a form of assignment. In their letter of transmittal, the attorneys stated that it was their information that Shelton "had accepted these assignments several times previously and are (is) familiar with them." Along with the assignment was attached the attorneys' "check for $100.00 for your assistance in this matter." There was no information given in the letter of transmittal about either the details of the accident or the extent of the minor's injuries. The assignment showed that nothing was paid or given by the assignee for the assignment; the only consideration on the part of Shelton as stated in the assignment itself was the agreement of the assignee to assume "his proportionate share of all costs and expenses in an action to be brought by him and me in the Court of Common Pleas for the above named County  *  *  *."[2]

Shelton, in his deposition, testified that he did not know the minor or his father, knew nothing of the accident (until he met the attorneys on the night before his deposition was taken) or the nature of the minor's injuries, had prior to the assignment no possible interest in the cause of action, knew nothing of the fee arrangement with the attorneys for the plaintiffs on the matter and stated that it did not "make any difference" to him what the "fee arrangement" with

1. The Court in Doremus v. Atlantic Coast Line Railroad Company (1963) 242 S.C. 123, 143, 130 S.E.2d 370, declined to pass on the power of a guardian *ad litem,* even where authorized by Court, to make a partial assignment of his minor's claim.

2. The defendant pressed the point that the terms of the assignment gave it a champertous character and, for this reason should be disregarded. Cf., Cooke v. Pool (1886) 25 S.C. 593; McConnell v. Kitchens (1884) 20 S.C. 430, and see, Kenrich Corporation v. Miller (3d Cir. 1967) 377 F.2d 312, 314; Jamison Coal & Coke Co. v. Goltra (8th Cir. 1944) 143 F.2d 889, 895:

"'Champerty consists of an agreement whereby a person without interest in another's suit undertakes to carry it on at his own expense, in whole or in part, in consideration of receiving, in the event of success, a part of the proceeds of the litigation.'"
Restatement of the Law of Contracts, Sec. 542; Corbin on Contracts, Vol. 6A, pp. 363–5.

Perhaps this contention presents a factor to be considered in determining the character of the assignment. In this case, however, I prefer to pass over such contention and to predicate my conclusions on the general spuriousness of the assignment, as established by the circumstances hereafter detailed. See, *Corbin, supra.*

such counsel was, had no responsibility in connection with the lawsuit, admitted that he had no control over the lawsuit or its possible compromise, conceded that his approval would not be required for a settlement of the action, and stated that he assumed that the purpose of the assignment was to defeat federal jurisdiction over the action. Mr. Shelton, also, testified he had acted as assignee in another similar situation in South Carolina but he did not know the result of the suit that followed.

The guardian *ad litem,* in his deposition, testified that, in agreeing to the assignment, he had merely followed the advice of his counsel. He did not know Shelton, had never met him, and had never communicated with him in any way. He did not furnish the $100 paid to Shelton. Shelton had no prior interest in the cause of action. The guardian *ad litem,* also, stated during his examination that Shelton was not bound to pay any hospital, doctor, or attorney's bills or "anything else in this case" and added that he did not know "what Mr. Shelton would receive out of the proceeds of the recovery". He did understand, however, he said, that "the sole purpose of the assignment was to defeat "a removal of this case to the federal court, United States District Court for the District of South Carolina, Charleston Division."

So much for the record on which the motion is to be resolved.

At the very outset, plaintiffs urge that the assignment, being valid under South Carolina law, is immune from scrutiny in this Court by reason of the *Erie* doctrine.[3] Moreover, they assert that if there be a claim of collusion, fraud, sham or want of good faith in the assignment—even though such fraud or collusion was for the very purpose of defeating the otherwise plain jurisdiction of the federal court—the proper forum for the adjudication of such issues is the State Court. In support of this contention they rely on Heape v. Sullivan (D.C.S.C.1964) 233 F.Supp. 127; Ridgeland Box Mfg. Co. v. Sinclair Refining Co. (D.C.S.C.1949) 82 F.Supp. 274; Hair v. Savannah Steel Drum Corporation (D.C.S.C.1955) 161 F.Supp. 654; King v. McMillan (D.C.S.C.1966) 252 F. Supp. 390; Arant v. Stover (D.C.S.C. 1969) 307 F.Supp. 144.[4] It must be emphasized, however, that *Heape* and the other cases from this District, (with the exception of the *Arant case* but see Note 4) were decided prior to the decision in Kramer v. Caribbean Mills, Inc. (1969) 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9, and were based on the law as it was then understood generally. In *Kramer,* however, Justice Harlan made it abundantly clear that, whatever the law may have been previously, the mere fact an assignment was indisputably valid under State law did not require that it be deemed *"valid for purposes of federal jurisdiction",* for, as he emphasized "The existence of federal jurisdiction is a matter of federal, not state, law." (p. 829 of 394 U.S., p. 1490 of 89 S.Ct.)[5] As the

---

3. Erie R. Co. v. Tompkins (1938) 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

4. It should be noted that the Court, in perhaps prophetic comment, in Arant v. Stover, at p. 151, said:

   "The conclusion is that the Fourth Circuit now frowns on the forum shopping practiced by invoking federal jurisdiction through artificial or collusive means. *Whether the brows of that mighty court will, at some latter date, be furrowed by concern over forum avoidance by the same practices this court does not predict."* (Italics added).

5. See, also, O'Brien v. Avco Corporation (2d Cir. 1969) 425 F.2d 1030, 1034:

"While a state may of course define and encourage certain fiduciary relationships, the characterization and effect of those relationships for the purposes of federal diversity jurisdiction is a federal question. (Citing cases) Accordingly, the legality of a relationship for state law purposes does not control its effect on federal jurisdiction."
Ferrara v. Philadelphia Laboratories, Inc. (D.C.Vt.1967) 272 F.Supp. 1000, 1008, aff., (2 Cir.) 393 F.2d 934:

"Diversity jurisdiction should not turn on the legality or validity of the transaction under state law. * * * Those transactions may well govern the rights

commentator in 15 Villanova L.Rev. 499, puts it, "This reasoning (of Justice Harlan) is noteworthy for otherwise state law could be used to exploit the jurisdiction of the federal courts. The ease with which this assignment device could manipulate federal jurisdiction through state law indicates that the expansion and limitation of diversity jurisdiction should be a matter handled by the federal courts and not state law." Thus, whatever may have been deemed the rule prior to *Kramer,* the proposition is now settled that in connection with motions of this character "neither state law nor rule 17 (a) demands adherence to the principle that the underlying motive or purpose of an assignment will not be examined." 83 Harvard L.Rev. 467.

■■ It is accordingly, the right of this Court, when the issue of federal jurisdiction is raised, to inquire into the purpose and character of an assignment, which either creates or defeats federal jurisdiction. Nor should the Federal Courts abandon such inquiry in favor of the State Courts for every Court has both the power and the obligation to protect its own proper jurisdiction and it ought not look to another court for such protection. Moore on Federal Practice, Vol. 3A, p. 154. Certainly the Federal Courts have not so deferred to the State Courts where there is a claim of a joinder of a sham resident-defendant for purposes of defeating jurisdiction; in fact, in such cases, the Supreme Court has declared it to be the duty of the District Court to resolve such issue, both factually and legally, the Court in Wilson v. Republic Iron & Steel Co. (1921) 257 U.S. 92, 97, 42 S.Ct. 35, 37, 66 L.Ed. 144, putting it, "the issues so arising must be heard and determined by the District Court". If the sham joinder of a resident-defendant for purposes of defeating federal jurisdiction is a matter for resolution by the District Court in determining its own jurisdiction, it would seem equally clear that the sham joinder of a resident-plaintiff for a like purpose

should similarly present an issue to be "heard and determined by the District Court".

■ And, in determining whether there is a sham joinder of either a plaintiff or a defendant for purposes either of creating or thwarting federal jurisdiction, the Court may properly look beyond the pleadings themselves and inquire into the basis for the joinder. As the Court stated in Smoot v. Chicago, Rock Island and Pacific Railroad Co. (10th Cir. 1967) 378 F.2d 879, 881–882, "While issues of liability may not ordinarily be determined on a motion to remand, it is well settled that upon allegations of fraudulent joinder designed to prevent removal, federal courts may look beyond the pleadings to determine if the joinder, although fair on its face, is a sham or fraudulent device to prevent removal." This rule has often been followed when the claim of sham joinder involved a co-defendant joined to prevent removal but, as I have said, no reason suggests itself why the same rule should not apply where the issue is the sham joinder of a co-plaintiff for a like purpose. It was applied to the co-joinder of a sham plaintiff, intended to frustrate the defendant's right of removal in the well-reasoned opinion of the Court in Gentle v. Lamb-Weston, Inc. (D.C.Me. 1969) 302 F.Supp. 161, where the Court dealt with the joinder of an assignee of a $\frac{1}{100}$ interest in the cause of action for the conceded purpose of defeating federal jurisdiction. That opinion has been approved by the commentators and is in accord with scholarly discussion of the subject. See 83 Harvard L.Rev. 465; 15 Villanova L.Rev. 499; Moore on Federal Practice, Vol. 3A, p. 156.

It is argued, though, that, while Congress has proscribed in specific legislation, collusive or sham assignments intended to create federal jurisdiction, it has not enacted similar legislative proscriptions of collusive or sham assignments to frustrate federal jurisdiction. From this, the plaintiffs would deduce

and duties of the parties to them *inter se,* and yet fail to satisfy the standards

by which their effect on the jurisdiction of the federal court is to be determined."

that Congress was indifferent to collusion intended to defeat jurisdiction. This argument is at variance with many authoritative related decisions. The contrary conclusion, as expressed in 83 Harvard L.Rev. 470, seems more reasonable: "The statute against improper creation of jurisdiction expresses legislative disapproval of the manipulation of federal jurisdiction to defeat its limitations. From that statute's very existence it can be inferred that Congress also disapproves of such manipulation to defeat the purposes of diversity jurisdiction." And this inference, as suggested by this commentator, that devices to frustrate federal jurisdiction will no more be tolerated than manipulations to create federal jurisdiction follows logically from the following language in Wecker v. National Enameling & Stamping Co. (1907) 204 U.S. 176, 27 S.Ct. 184, 51 L.Ed. 430, as quoted by Judge Gignoux in Gentle v. Lamb-Weston, Inc., *supra* (at p. 165 of 302 F.Supp.):

> "While the plaintiff, in good faith, may proceed in the state courts upon a cause of action which he alleges to be joint, *it is equally true that the Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court as to permit the state courts, in proper cases, to retain their own jurisdiction.*"

█ The Federal Courts, in looking behind the joinders of sham defendants in order to uphold a non-resident's right to a removal to the Federal Court, acted without benefit of a Congressional statute. They founded their right to make such inquiry upon the duty of the Federal Court to protect its proper jurisdiction from collusive devices. See Bernblum v. Travelers' Ins. Co. (D.C.Mo.

1934) 9 F.Supp. 34, 35.[6] That same inherent obligation falls on the Court in this type of case.

Accepting the premise that this Court has the power to look behind the joinder of Shelton to determine whether it is sham, Amar v. Garnier Enterprises, Inc. (D.C.Cal.1966) 41 F.R.D. 211, indicates the criteria to be applied in determining whether such assignment or transfer is to be deemed a sham. In the cited case, a transfer of stock was made to the plaintiff in order to enable him, as a non-resident, to file in federal court a stockholders' derivative suit. It was the contention of the transferee that he had purchased his stock, making a substantial down-payment and giving a note for the balance. This claim, however, was disputed. It was uncontested, however, that the transferee was ignorant largely of the nature of the cause of action. He was uncertain about his relationship with his attorney (who, incidentally, was employed by his transferor) or what control he had over the litigation. While it seemed admitted that the purpose was to create federal jurisdiction, the plaintiff argued that "the motive of the transferor makes no difference", an argument which the Court answered with the statement that, "This may be so when the transfer is real, complete and bona fide; but the motive of the transferor is an important consideration in determining whether the transfer actually was real, complete and bona fide."[7] It is true that this was an action involving a transfer designed to create federal jurisdiction, but it states the criteria for establishing a sham joinder which are equally applicable to cases where the transfer or assignment is to defeat federal jurisdiction.

██ Applying the criteria outlined in *Amar* to the facts here, a finding in this case of sham joinder is more required than in either the *Gentle* or *Amar*

---

6. The Court in this case said:

> "The federal court will look through a mere sham, created and resorted to for the sole purpose of defeating federal jurisdiction, to discover the true situation both as to parties and causes of action and on the basis of the true situation so disclosed will determine the matter of jurisdiction."

7. At page 216.

*cases.* Here, the assignment was made without any present consideration. By the assignee's own statement, he acquired no real rights in the cause of action, a nominal part of which was transferred to him. He was not to be consulted about any settlement of the cause of action. He testified that, though a nominal assignee, he expected to have no control over the action to be instituted. He had no knowledge of the arrangement with his own attorney and expressed complete indifference to the subject. Before taking the assignment, he made no inquiry of the nature of the cause of action or of the minor's alleged injuries; in fact, he did not know either his co-plaintiff or his attorney and had no prior interest in or connection with the cause of action. By this assignment, he was not purchasing an interest in a cause of action; he was, under the admitted facts being employed and paid to permit the use of his name as a co-plaintiff to defeat federal jurisdiction. Such an arrangement represents, to use Professor Field's expression in 17 S.C.L.Q. 671, "an affront" to the federal court and its jurisdiction. It is inconceivable that a Court could permit such a thwarting of its jurisdiction or countenance such a sham, especially when the very purpose of such manipulation is the denial to the defendant of the very right which the diversity jurisdiction of this Court was intended to secure.[8]

It must be emphasized that in this case it is not simply the motive of the assignment that commands its disregard for federal jurisdictional purposes. If an assignment is actual and real, rather than feigned or colorable, it may be the Court will not inquire into the motives or purposes when deciding jurisdiction.[9] Stated somewhat differently, mere motive may not be sufficient to invalidate for jurisdictional purposes but it is a fact to be taken into consideration in the final determination whether the assignment is sham or colorable.[10] However, we have considerable more than motive in this case. This assignment is manifestly "colorable" and "feigned". The assignee, as we have already indicated, is an "employed" assignee. When evidence of an assignment of this character (assuming the term "assignment" can properly be applied to such a transaction) is added to the admitted purpose of defeating jurisdiction, the conclusion is inescapable, it appears to this Court, that the assignment must be disregarded for jurisdictional purposes.

I accordingly find and conclude that the assignment to the plaintiff Shelton herein was a sham entered into collusively for the purpose of defeating the defendant's proper right of removal to this Court and must be disregarded for purpose of federal jurisdiction of this cause. As between the real plaintiffs and the defendant, there is accordingly the required federal diversity jurisdiction. Motion to remand is denied.

And it is so ordered.

This decision involves a determination of an issue which is common to a number

---

8. As stated *supra*, the guardian *ad litem's* application for authority to make the assignment openly declared that its purpose was to retain jurisdiction in the State Court where it was believed that jurors drawn from the plaintiff-guardian *ad litem's* home county would give him "a more favorable verdict" than a jury in federal court.

9. Cf., Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab & Transfer Co. (1928) 276 U.S. 518, 524, 48 S.Ct. 404, 405, 72 L.Ed.2d 681:

"The succession and transfer were actual, not feigned or merely colorable. In these circumstances, courts will not inquire into motives when deciding concerning their jurisdiction."

The comment in 83 Harvard L.Rev. 473, note 61, suggests that where there is an assignment that defeats federal jurisdiction, the rule might well be adopted that the burden, in such a case, of establishing that the assignment was in good faith and not a sham or colorable passes to the assignee. It is not necessary to consider such question in this case, since the record abundantly sustains the "sham" and "colorable" character of the assignment.

10. See Henley & Co. v. Miller Golf Equipment Corporation (D.C.P.R.1969) 300 F.Supp. 872, 876; Farrell v. Ducharme (D.C.Vt.1970) 310 F.Supp. 254, 258–259.

of other decisions presently pending in this Court. The issue in question has been previously considered by other Judges of this Court and decided contrariwise to the present decision (though prior to, in practically all instances, the decision in the *Kramer case*). On the other hand, a District Court of another Circuit has decided the issue in the same manner as this Court now does. There has arisen thus considerable difference of opinion on this issue, which will undoubtedly arise in other causes in this Court as well as in other Districts. For such reasons, it would seem that an interlocutory appeal, as provided in 28 U.S.C. 1292(b), so as to set at rest promptly this important difference of opinion on a material matter that will arise in other cases as well as in this one, would materially contribute to the orderly disposition of this cause as well as other causes either pending or likely to be brought before this Court.

It was indicated on hearing that plaintiffs might be unable financially to defray costs of appeal. For this reason,

It is ordered, that the plaintiffs be allowed to proceed without the prepayment of fees and costs.